**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

**UNITED STATES OF AMERICA**

      Plaintiff,

v.                                        Criminal No. 99-1266 BB

**NORMAN LEE HEATH,**

      Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendant's Motion to Suppress Evidence (Doc. 13), filed on January 14, 2000. The Court has held a suppression hearing, and reviewed the motions, the memoranda submitted by the parties, and the relevant authorities. The Court finds that Defendant's Motion is well taken. The Court, therefore, GRANTS Defendant's Motion to Suppress Evidence.

## I. FACTUAL FINDINGS

In mid-September 1998, the police came into contact with Brad Hessler who was pulling a flat-bed trailer loaded with stolen semi-truck tires and tire parts. The trailer also contained a mobile methamphetamine lab, which Mr. Hessler admitted was his own. After questioning Mr. Hessler, the police learned that he had received the stolen goods from Rod Swanson who lived at 1721 Potomac S.E. in Albuquerque. Based on this and visual observations of the property, the police then sought and obtained a search warrant to search 1721 Potomac S.E. for stolen tire and tire parts. On Thursday, September 24, 1998 they executed the warrant.

-1-

The police found stolen tires and tire parts on the property.  Despite police information indicating that Mr. Swanson performed methamphetamine cooks at 1721 Potomac S.E., the police found no evidence of a methamphetamine lab.  As the police department finished up its search of the premises, they noticed a white pickup truck, driven by Norman Heath, coming down Potomac towards 1721.  According to Detective Jim Arrington, Mr. Heath drove very slowly along the road and appeared to be looking at the police activity.  Detective Arrington testified Mr. Heath made a slight swerve towards 1721, and then continued on to a residence further down the street.  Detective Arrington explained that Mr. Heath got out of his truck, started up towards the house, but after he was approximately 15 feet away from the door turned around and went back to his truck, all the while looking over at the police activity at 1721 Potomac.

At some point in time during this sequence, Detective Arrington asked  Christine Dillman, wife of Rodney Swanson and the apparent owner of the residence at 1721 Potomac, whether she knew the driver of the truck.  Ms. Dillman identified the person in the truck as "Norman," a friend of her husband.  She also explained that Mr. Heath owned a trailer in her back yard and would usually come by the house on Thursdays.

Detective Arrington called to a uniformed officer, Pat Castillo, standing by a marked police car, to stop Defendant's truck.  Detective Arrington testified that he had the car pulled over because of Mr. Heath's suspicious actions, and because the police had been unable to identify the owner of the trailer Mr. Hessler used to haul the stolen tires.  Officer Castillo waived Defendant over and asked him his name and asked him for his identification.  Officer Castillo testified that Mr. Heath readily complied with these requests and appeared entirely cooperative.  Detective Arrington, who watched this take place as he walked towards the car, stated Mr. Heath

appeared "extremely nervous" because he had not turned the engine off, he was constantly looking around, and he fidgeted with his hands in an excessive manner. Detective Arrington also stated Mr. Heath moved his hands out of his view. Detective Arrington explained he asked Mr. Heath to turn off the engine to prevent him from driving off. He also explained that based on Mr. Heath's actions he was concerned for his safety and the safety of the other officers present, so he asked if Mr. Heath "would mind exiting the vehicle."

After stepping out of the car, detective Arrington asked Mr. Heath for permission to conduct a pat-down, and Mr. Heath agreed.[1] Detective Arrington testified Mr. Heath reached for his right pocket several times and the detective repeatedly told Mr. Heath to raise his hands. Detective Arrington then patted down the right pocket and felt a plastic bag with a kind of "wet powder" feel, which he could not identify. Although he did not think or suspect the unknown item was a weapon, detective Arrington asked Mr. Heath if he "would mind removing the object," from his pocket. Mr. Heath removed a small plastic baggie containing a green-tinted wet substance. Detective Arrington asked Mr. Heath what the substance was and Mr. Heath explained it was glass glazing. Detective Arrington testified that even after seeing the baggie he had no idea what the substance was. Nonetheless, he told Mr. Heath that he did not believe the substance was glass glazing. Mr. Heath then told detective Arrington the substance was methamphetamine.

---

[1]There are slightly different accounts of this sequence in detective Arrington's testimony from the suppression hearing and his statement in the Criminal Complaint. In detective Arrington's testimony he explained he asked Mr. Heath if he had any weapons and then, after a negative reply, asked him for permission to search him for weapons. In the Criminal Complaint, detective Arrington stated he conducted a pat-down search of Mr. Heath because after he exited the truck he kept placing his hand in his right pocket.

Detective Arrington testified Mr. Heath was cooperative throughout the event, and he estimated the entire encounter, from the time Mr. Heath was pulled over to the time the police arrested him, lasted a couple of minutes. Mr. Heath has moved to suppress all physical evidence and all written and oral statements made after the stop and search.

## II.  DISCUSSION

Based on Mr. Heath's unusual behavior and the information obtained from Ms. Dillman, the Court finds the initial stop of Mr. Heath was justified under Terry v. Ohio, 392 U.S. 1, 21 (1968) ("the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."). And, although somewhat more questionable, the Court also finds detective Arrington's frisk of Mr. Heath for officer safety reasons, reasonable. Nevertheless, the Court finds that once detective Arrington had conducted a pat-down and found no weapons, the search should have ended. The government argues the continuation of the search was justified because Mr. Heath consented to it. After careful consideration of the specific circumstances of this encounter, the Court disagrees and finds no valid consent to the search.

In Minnesota v. Dickerson, 508 U.S. 366 (1993), the Supreme Court determined that if an officer, conducting a lawful pat-down of a person, feels an object whose "contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." Id. at 375. There is no question, and the

government concedes as much[2], that if <u>Dickerson</u> controls this case, then detective Arrington cannot justify his seizure of the methamphetamine because he did not know what the object was.

The government argues, however, that the facts of this case are distinguishable from <u>Dickerson</u> because Mr. Heath consented to the search. In support of its consent argument the government points to <u>U.S. v Lang</u>, 81 F.3d 955 (10th Cir. 1996). In <u>Lang</u>, several officers pulled over two men suspected of criminal activity. After directing the two men to exit their vehicle, the officers conducted a pat-down search and found no weapons or contraband on the driver of the vehicle. The officers' pat-down of the passenger, however, "revealed a suspicious bulge protruding from the suspect's left front pants pocket." 81 F.3d at 960. One of the officers then asked the suspect what was in his pants pocket and the suspect replied 'money.' The officer then asked the suspect's permission to examine the 'money' and the suspect consented. Concerned the suspect might not have understood the question, the officer repeated the question, "this time looking the passenger directly in the eyes." <u>Id</u>. After receiving the suspect's consent, the officer reached in and pulled out cocaine.

After weighing the facts, the court concluded the case did not stand or fall on <u>Dickerson</u>, because the officer had received the defendant's consent. The court then briefly considered whether the defendant's consent was voluntary and found that it was. The government argues just as the search and seizure of the cocaine in <u>Lang</u> did not violate <u>Dickerson</u> because of the

---

[2]"[I]n this case, the seizure of the Methamphetamine from [D]efendant's front pocket cannot [be] justified under <u>Dickerson</u> . . . because the incriminating nature of the contraband was not immediately apparent from the pat-down search." United States Supplemental Memorandum in Response to Defendant's Motion to Suppress Evidence, at 6-7.

defendant's consent to the search, officer Arrington's search and seizure of the methamphetamine in this case did not violate Dickerson because of Mr. Heath's consent.

The initial and primary distinction between this case and Lang is that there was no "suspicious bulge protruding from the suspect's [right] front pants pocket." Indeed, detective Arrington testified that while he did not know what the small wet packet was, he did not seriously consider it a weapon. As the "wants and warrants" check by officer Castillo had by then proved negative, detective Arrington should have proceeded to question Mr. Heath about the cause of the stop (i.e. trailers and tires) or released him to leave. A "'careful [tactile] exploration of the outer surfaces of a person's clothing all over his or her body' is a 'serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly.'" Bond v. United States, --- S.Ct. ---- 2000 WL 381264 (U.S. April 17, 2000) (quoting Terry v. Ohio, 392 U.S. 1, 17-18 (1968)). If Minnesota v. Dickerson stands for anything, it is the proposition that the police are not entitled to go the next step and have citizens empty their pockets without probable cause or a reasonable fear for their safety. "[W]hen a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under Terry." Baker v. Monroe Township, 50 F.3d 1186, 1194 (3rd Cir. 1995) (citing Minnesota v. Dickerson, 508 U.S. 366 (1993)).

Nor can the Court conclude Mr. Heath's consent was voluntary. The issue of "[w]hether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances." United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998) (citing United States v. Santurio, 29 F.3d 550, 552 (10th Cir.1994)). In United States v. Angulo-Fernandez, 53 F.3d 1177, (10th Cir. 1995), the Tenth Circuit delineated a two

part test to determine whether a defendant's consent is voluntary. The government must: (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given;" and (2) "prove that this consent was given without implied or express duress or coercion." 53 F.3d at 1180 (internal quotations and citations omitted). The government bears the burden of proving this consent. 143 F.3d at 1366. Here, after considering the particular sequence of events and the overall atmosphere, the Court finds Mr. Heath did not voluntarily consent to the further search of the object in his pocket.

In considering the 'totality of circumstances,' it is useful to begin with a brief summary of the events. First, officer Castillo motioned for Mr. Heath to pull over behind two police cars. Almost immediately after being pulled over and producing his diver's license, detective Arrington asked him to turn the truck's engine off, and then asked Mr. Heath if he "would mind stepping out of the vehicle." Detective Arrington asked Mr. Heath whether he had any weapons and then asked him if he could search Mr. Heath for weapons. Then, as Mr. Heath stood with his hands up in the air beside two police squad cars, with numerous policeman around[3], and with police officer Castillo holding onto his identification to run a background check, detective Arrington asked Mr. Heath if he "would mind removing the object" from his pocket.

The cardinal issue, then, is whether Mr. Heath's response to detective Arrinton's last question constituted a voluntary consent to the search. After carefully considering the sequence of events and the requests from detective Arrington, the Court finds, in the context of this case,

_____

[3]Detective Arrington explained several times that one of the three reasons he found Mr. Heath's actions suspicious, as Mr. Heath drove down Potomac Street, was that Mr. Heath continually stared at the police activity going on in the execution of the search warrant at 1721 Potomac. The Court, therefore, finds Mr. Heath was well aware of the presence of the police team.

the final exchange between detective Arrington and Mr. Heath was not an attempt by the detective to obtain consent for the search but a directive to Mr. Heath to remove the object from his pocket. Essentially, the Court has trouble finding any meaningful distinction between detective Arrington asking Mr. Heath to "would you mind removing the object" from his pocket, and detective Arrington asking Mr. Heath to: (1) turn off the truck's engine; (2) step out of the vehicle; and (3) allow him to conduct a pat-down search, all of which had the implicit threat of force behind them. This is reinforced by detective Arrington's repeated direction that Mr. Heath remove his hand from his pocket and keep his hands in the air.

In all of these instances, detective Arrington testified he "asked" Mr. Heath to do something, which Mr. Heath then did. Logically, there is a difference between using the term "asked" to signify a command or order, and using the term "asked" to signify a call for an answer. The fact this distinction can be drawn theoretically, however, means little in the specific context of this case where the actions detective Arrington "asked" Mr. Heath to do were in fact directives to do those actions. Detective Arrington, for example, testified that as he first approached Mr. Heath in the truck he was concerned Mr. Heath would attempt to escape so he "asked" Mr. Heath to turn off the truck engine. Whatever the precise language he used, clearly, this was an order from a concerned police officer: "turn off the truck engine." Implicit in this order, was the threat of force if Mr. Heath failed to comply: "turn off the truck engine, or else . . ."[4]

Presumably, the government urges the Court to draw a distinction between detective Arrington's requests that were clearly directives to do something with an implicit threat of force

_____

[4] The Court notes there is nothing unwarranted about this action – if detective Arrington wanted to question Mr. Heath, he needed to ensure Mr. Heath's continued presence at the scene.

behind them, such as asking Mr. Heath to turn the engine off, and detective Arrington's final statement to remove the object, which the government characterizes as a request for consent. The key distinction, so the argument goes, is that in this last request detective Arrington genuinely sought Mr. Heath's consent as evidenced by the detective asking "would you mind removing the object," rather than more plainly ordering him to do so. After considering the record, the Court finds no merit to this distinction.

Shortly before asking Mr. Heath if he "would mind removing" the object from his pocket, detective Arrington testified he asked Mr. Heath if he "would mind exiting the vehicle." In the Court's view after listening to detective Arrington's testimony, the second statement was unquestionably not open to multiple responses. Detective Arrington had previously testified that Mr. Heath's nervousness and his hand movements had made the detective concerned for his own safety and the safety of other officers, and, for these reasons, he directed Mr. Heath to exit the vehicle. Detective Arrington testified that his specific intent in requesting Mr. Heath to exit the truck was to conduct a pat-down. With these facts in mind – the potential threat to officer safety and the desire to conduct a pat-down as soon as possible – clearly detective Arrington's question "would you mind exiting the vehicle," permitted one possible response from Mr. Heath – stepping out of the vehicle. Detective Arrington *needed* Mr. Heath to exit the vehicle and to do so quickly. Again, as with other requests from the detective, implicit in detective Arrington's request to exit the vehicle was the perhaps reasonable, but nonetheless threatening use of force, if necessary to accomplish detective Arrington's objectives. Based on this testimony, the Court finds detective

Arrington's testimony consistently demonstrates that his statements "would you mind . . .," if conceivably characterized as questions at all, were rhetorical at best.[5]

In its overall analysis, the Court finds it significant that detective Arrington never informed Mr. Heath of his right to refuse permission to the search. Although in <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973), the Supreme Court held an officer does not have to inform a suspect of his right to refuse permission in order to have his consent deemed valid, the Court also explained a defendant's lack of awareness is one factor, among many, that may be considered in determining the voluntariness of his consent. <u>Id.</u> at 225. See also, <u>Florida v. Royer</u>, 460 U.S. 491, 503 (1983). In this case, in the context of the preceding interaction between detective Arrington and Mr. Heath, the Court finds it significant that detective Arrington did not inform Mr. Heath of his right to refuse the search or at least do something to distinguish this final request from the earlier non-negotiable requests and thereby defuse the implicit use of force to require compliance.

The fact that detective Arrington did not distinguish this final question in any way from his earlier requests reveals a critical difference between the facts in this case and the facts in <u>Lang</u>. In <u>Lang</u>, even though the officer did not inform the suspect of his right to refuse permission to search, he made a clear effort to determine whether the suspect was voluntarily consenting to the search. After asking the suspect once and receiving permission, he "looked at the suspect directly in the eyes" and asked for permission a second time. By asking the question twice, the officer defused any implicit threat of force by demonstrating that the suspect truly had a choice in his

---

[5]Anyone stopped on the highway by a police officer recognizes the question "would you mind removing your driver's license" from the wallet is not a question but a command.

answer to the officer's question.  It is this choice and defused threat that are strikingly absent from the case at bar.

In the end, then, it is not the presence or absence of any one particular event, but the overall effect of the facts of this case in its entirety that leads the Court to conclude Mr. Heath did not voluntarily consent to the search of his pocket.

## **ORDER**

For all the reasons stated above, this Court finds the government fails to show Mr. Heath voluntarily consented to the search of his pocket.  For this reason, the Court finds all the physical evidence and statements made by Defendant after the illegal search should be suppressed.

IT IS HEREBY ORDERED that Defendant's Motion to Suppress (Doc. 13) be, and hereby is, GRANTED.

Dated at Albuquerque this 18th day of April, 2000.

_Bruce D. Black_
BRUCE D. BLACK
United States District Judge

**Attorneys:**

**For Government**
Neil J. Gallagher, Jr.
Special Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103

**For Defendant**
Ken Neundorf
506 Slate N.W.
Albuquerque, New Mexico 87102